E-FILED
Wednesday, 06 April, 2011 02:12:35 PM
Clerk, U.S. District Court, ILCD

IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
SPRINGFIELD DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 11-30008 |
| | ) | |
| JIMMY T. WATSON, | ) | |
| | ) | |
| Defendant. | ) | |

# REPORT AND RECOMMENDATION

BYRON G. CUDMORE, U.S. MAGISTRATE JUDGE:

This matter comes before the Court for a Report and Recommendation on Defendant Jimmy T. Watson's Motion to Suppress Physical Evidence [.357 Taurus Firearm] and Custodial Statement (d/e 6) (Motion). The Motion is fully briefed, and the District Judge has referred the matter for an evidentiary hearing and Report and Recommendation. This Court conducted the evidentiary hearing on March 31, 2011. The Defendant appeared personally and by his counsel Assistant Federal Public Defender Thomas G. Wilmouth. The Government appeared by Assistant United States Attorney Gregory M. Gilmore. After carefully considering all of the submissions of the parties and the evidence presented, and pursuant to 28 U.S.C. § 636(b)(1)(B), I recommend that the Motion be DENIED.

# I. BACKGROUND[1]

On Saturday November 27, 2010, at approximately 8:30 a.m., Springfield, Illinois, Police Officer Ronald Williams received a telephone call on his cell phone. Officer Williams was off-duty when he received the call. Officer Williams was just leaving his residence at the time. The display on the phone indicated that the caller was a confidential informant (CI) that Officer Williams had worked with for several years. Officer Williams answered the phone. Officer Williams recognized the voice of the caller as that of the CI. The CI told Officer Williams that a black man wearing a red coat named "Jimmy" was currently at the intersection of 15th Street and Brown Street in Springfield, Illinois, and was carrying a ".357" or a "Gatt".[2] Officer Williams understood the CI to mean that Jimmy was carrying a .357 handgun.

Officer Williams had been a Springfield Police Officer for approximately ten years at the time that he received the call. Officer Williams was assigned to the Street Crimes Unit at the time. Officer Williams testified that he had known the CI for more than two years and that the CI had given reliable information in the past. Officer Williams testified that the CI had given information that led to the recovery of two

---

[1] This Report and Recommendation is prepared without the benefit of a transcript.

[2] Officer Williams testified that the CI said either ".357" or "Gatt". Officer Williams did not spell the term "Gatt".

illegally possessed weapons and to the arrest of two or three individuals who were wanted on outstanding warrants.  On cross examination, Officer Williams could not give any details about the previous incidents, except that one of the tips that led to the recovery of a weapon occurred within a year of the call on November 27, 2010, and the other tip that led to the recovery of a weapon occurred more than a year before November 27, 2010.

     Officer Williams drove to the east side of Springfield near South Grand Blvd.  Brown Street runs parallel to South Grand one block to the north.  Officer Williams was driving an unmarked police car.  Officer Williams flagged down Springfield Police Officer Mark Houston.  Officer Houston was in uniform on patrol driving a marked squad car.  Officer Williams testified that the two of them pulled into the Elks Lodge parking lot at Martin Luther King Boulevard and Brown Street.  The meeting occurred approximately five to seven minutes after Officer Williams had received the call.  Officer Williams told Officer Houston the information about the black man at 15th and Brown.  Officer Houston radioed the information to Springfield Police Department Dispatch (Dispatch).  Officer Williams and Officer Houston then drove their vehicles down Brown Street toward 15th Street.

At the time, Springfield Police Officer Donald Anderson was in uniform on patrol in a marked squad car. Officer Anderson testified that approximately 8:45 a.m., he heard Officer Houston's radio transmission. Officer Anderson radioed to Dispatch that he was responding to the call. He drove north on 15th Street toward Brown Street.

Officer Williams arrived at the intersection of 15th and Brown first, with Officer Houston following directly behind him. He saw a black man, Defendant Jimmy Watson, in the street wearing a red coat. Officer Williams drove his unmarked car through the intersection and parked in a driveway located twenty to thirty feet past the intersection. Officer Houston stopped at the intersection. Officer Anderson arrived as Officer Williams was driving through the intersection. All of the officers observed Watson walking in the street. Officer Anderson testified that Watson walked west across 15th Street and continued walking west in the street on Brown Street. Brown Street had sidewalks available for pedestrians.

Officer Anderson pulled his squad car close to Watson and stopped. He exited his vehicle and directed Watson to walk back to Officer Anderson's squad car. Watson turned around and walked back as ordered. Officer Houston then exited his vehicle and walked toward Officer Anderson and Watson. By this time, Officer Williams began to exit his car. Once Officer Williams exited his vehicle, he saw Officer Anderson, Watson,

and Officer Houston together next to the hood of Officer Anderson's squad car. Officer Williams recognized Watson to be Jimmy Watson. Officer Williams knew Watson from patrolling in the community. Officer Williams could not remember details regarding his prior knowledge of Watson, except that he had not previously arrested Watson.

Officer Anderson told Watson two or three times to put his hands on the hood of the squad car, but Watson did not respond or comply. Officer Houston then grabbed Watson's left arm and Officer Anderson grabbed Watson's right arm and the two officers forced Watson's hands onto the hood of the car. Watson did not resist significantly, but did not comply voluntarily either. Officer Anderson and Officer Houston started a pat-down search of Watson. Watson shifted his right side up against the car so that Officer Anderson could not search that area. Officer Anderson told Officer Houston that Watson had something on his right side. Watson said that it was only his gun. Officer Anderson then reached under Watson's coat and retrieved a .357 Taurus handgun from Watson's person. Watson was then handcuffed and placed in a squad car. The officers then found a bag of white powder on the ground where Watson was searched. The contents of the bag tested positive for cocaine.

## II. ANALYSIS AND CONCLUSIONS OF LAW

Watson moves to suppress the weapon and his statements to the officers. Watson argues that the officers violated his Fourth Amendment rights by conducting an illegal arrest and search of his person. He argues that the weapon should therefore be suppressed. He argues that his statements should be suppressed as the fruit of the illegal search. See Wong Sun v. United States, 371 U.S. 471, 485-86 (1963).

The Fourth Amendment protects individuals from unreasonable searches and seizures. Generally, searches and seizures must be conducted pursuant to a warrant issued by a neutral magistrate upon on a showing of probable cause. Illinois v. McArthur, 531 U.S. 326, 330 (2001). Law enforcement officers, however, can conduct reasonable searches and seizures without a warrant if the facts and circumstances fit certain recognized exceptions to the warrant requirement. See Arizona v. Gant, __ U.S.__, 129 S.Ct. 1710, 1716 (2009).

One established exception to the warrant requirement provides that an officer may stop an individual and investigate if the officer has a reasonable articulable suspicion that illegal activity may be afoot. Terry v. Ohio, 392 US. 1, 21 (1968). The stop and investigation must be reasonable under the circumstances. If, under the circumstances, the officer has a reasonable basis to believe that the individual may be armed,

the officer may take reasonable steps to protect himself and may conduct a pat-down search of the exterior of the individual's clothing to determine whether the individual is armed. Id., at 27.

A confidential informant may provide a tip that gives the officers a reasonable articulable suspicion that criminal activity may be afoot. United States v. Ganser, 315 F.3d 839, 843 (7th Cir. 2003). In determining whether the tip provides a basis for reasonable suspicion, the Court must evaluate "the amount of information given, the degree of reliability, and the amount of police corroboration." Id. (quoting United States v. Price, 184 F.3d 637, 640 (7th Cir. 1999)). "[I]f 'an informant is shown to be right about some things, he is probably right about other facts that he has alleged, including the claim that the object of the tip is engaged in criminal activity.'" United States v. Price, 184 F.3d at 637 (quoting Alabama v. White, 496 U.S. 325, 331 (1990)).

In this case, the CI provided reasonable suspicion to detain Watson and investigate. The CI had given reliable information before, including information within the previous year that led to the recovery of a weapon. The CI also provided detailed information. The CI told Officer Williams: (1) the exact location of the individual; (2) the race of the individual; (3) the gender of the individual; (4) the fact that the individual was wearing a red coat; (5) that the individual was carrying a firearm; and (6) the first name of

the individual, Jimmy. Prior to initiating the stop, the officers corroborated the CI's detailed information except Watson's first name.[3] Within fifteen minutes after the CI's call, the officers observed Watson, a black man in a red coat, walking at the intersection of 15th and Brown. Based on all the circumstances, the officers had a reasonable suspicion to believe that criminal activity may be afoot, and so, to detain Watson and investigate. See Ganser, 315 F.3d at 843.

The officers further had a basis to pat-down Watson because the CI stated that the man was armed. See Terry, 392 U.S. at 27. The officers placed Watson's hands on the hood of the car in order to conduct the pat- down. Watson volunteered that the object on his right side was his gun during the pat-down search. At that point, the officers clearly had reasonable basis to reach under Watson's coat to remove the weapon for officer safety, if nothing else. The evidence establishes that the officers conducted a proper investigative stop and pat-down search based on reasonable articulable suspicion. Watson's motion, therefore, should be denied.

Watson argues that the CI did not provide the officers with reasonable suspicion because the Government failed to present sufficient

---

[3]Officer Williams testified that he recognized Watson after he exited his vehicle. By that time the other two officers had already stopped Watson.

evidence that the CI had been reliable in the past. Watson argues that Officer Williams testified in only a conclusory fashion that the CI was reliable. On cross examination, Officer Williams could not remember any details of the past tips that the CI or the results of those tips. The Court agrees that Officer Williams' testimony about the past reliability of the CI was largely without detail. Even so, the officers had a reasonable articulable suspicion under all of the circumstances of this case.

This case is quite similar to the circumstances in the Ganser case decided by the Seventh Circuit. There, the police chief of Woodhull, Illinois, called the postal inspection service to report that a confidential informant provided information that a man named Steven Simmons of Colona, Illinois, was receiving methamphetamine through the mails from a person named "Cheryl" from Long Grove, California. The informant stated that Simmons would receive the next shipment of methamphetamine in a greeting card sometime between September 28 and September 30, 1999. Simmons did not receive a card between September 28, and September 30, 1999. Rather, on October 21, 1999, the Colona Postmaster received a card for delivery addressed to Simmons with a return address that read, "Cheryl Ganser, 1672 Main St. E318, Ramona, CA 92065." The only evidence regarding the reliability of the informant was the Woodhull police chief's statement that the informant was reliable. Ganser, 315 F.3d at 841.

The Seventh Circuit held in Ganser that the postal inspector had reasonable articulable suspicion to detain that greeting card for more than a day to bring in a drug-sniffing dog to smell the letter for indications of drugs. The Seventh Circuit concluded the informant gave enough accurate detail to provide reasonable suspicion even though the informant was wrong about the town in California from which the letter would be sent and the time frame of the mailing, and even though there was virtually no evidence regarding the informant's past reliability.

The facts and circumstances here provided a much stronger basis for reasonable suspicion than those in Ganser. Officer Williams testified that the CI was reliable in the past. Officer Williams' testimony was largely conclusory, but he gave some details: the tips led to the recovery of two weapons and two or three arrests, and one of the weapons was recovered within a year of the November 27, 2010, incident. In addition, the CI was right about every detail. He was right about the gender of the suspect, the race of the suspect, the clothing of the suspect, the location of the suspect, and the first name of the suspect. The officers corroborated all of those details except the name before initiating the investigative stop. Based on the Seventh Circuit's guidance in Ganser, the officers here had a reasonable articulable suspicion that criminal activity might be afoot. The investigative stop of Watson was proper.

Watson argues, alternatively, that the officers did not conduct an investigative stop, but immediately arrested him without probable cause and then conducted a full blown search of his person.  The facts simply do not support this argument.  The officers did not tell Watson that he was under arrest initially.  The officers merely stopped Watson to investigate the possibility that he was illegally carrying a weapon.  The officers conducted a pat-down search for officer safety, not as part of an arrest.  The officers grabbed Watson's arms only after he refused to comply with Officer Anderson's instruction to place his hands on the car hood.  There is no evidence that the officers arrested Watson until Watson volunteered that he was carrying a weapon and the officers removed the .357 Taurus handgun from Watson's person.  Watson's attempt to characterize this stop as an immediate custodial arrest rather than an investigative stop is meritless.

Even if Watson is somehow correct and the officers had arrested Watson immediately upon arriving at the scene, the weapon and statements would still not be suppressed.  Upon arrival at the scene, Officer Anderson observed Watson walking on the roadway through the intersection of 15th and Brown, and then continuing to walk on the roadway on Brown Street.  Sidewalks were provided for pedestrian traffic along Brown Street.  Walking on the roadway when sidewalks are available is a traffic violation in Illinois.  625 ILCS 5/11-1007.  Officers who observe a

person commit a traffic violation have probable cause to arrest the person. See United States v. Tinnie, 629 F.3d 749, 752 (7th Cir. 2011). Officers in Illinois may effect a full custodial arrest for a minor traffic violation. 725 ILCS 5/107-2(1)(c); People v. Taylor, 388 Ill.App.3d 169, 178, 902 N.E.2d 751, 758 (Ill.App. 2d Dist. 2009); see Atwater v. City of Lago Vista, 532 U.S. 318, 348-49 (2001). If the officers have probable cause to arrest without a warrant, the stop and search are valid regardless of the officer's subjective motives or purposes. Whren v. United States, 517 U.S. 806, 812-13 (1996). Upon effecting a full custodial arrest, the officers may conduct a search incident to arrest. United States v. Robinson, 414 U.S. 218, 234 (1973). Thus, even if the investigative stop somehow was actually a full custodial arrest, the officers did not violate Watson's rights because they had probable cause to arrest him for the traffic violation.

## III. CONCLUSION

WHEREFORE, this Court recommends that Defendant Jimmy T. Watson's Motion to Suppress Physical Evidence [.357 Taurus Firearm] and Custodial Statement (d/e 6) be DENIED. The parties are advised that any objection to this Report and Recommendation must be filed in writing with the Clerk of the Court within fourteen days after being served with ECF copy of this Report and Recommendation. See 28 U.S.C. § 636(b)(1). Failure to file a timely objection will constitute a waiver of objections on

appeal. See Video Views, Inc. v. Studio 21, Ltd., 797 F.2d 538, 539 (7th Cir. 1986); Local Rule 72.2.

ENTER: April 6, 2011

                        *s/ Byron G. Cudmore*
                        BYRON G. CUDMORE
             UNITED STATES MAGISTRATE JUDGE